The next case is 412-0563, Boland Managed Services Incorporated v. Coral Chemical Company. The appellant is Mercer Turner. Before I begin, I want to mention that the court requests attorneys to be here early so that if it so happens that our case is permitted, we can start early. And that's where we are now. You are both here. Thank you for that. So we can proceed then early. Mr. Turner, you may proceed. May it please the court and counsel. Good morning, your honors. It's our pleasure to be here this morning. It's a great spring day here in the 4th District. It's always a great day in the 4th District, Mr. Turner. And we're very pleased to be able to present our case. I'd like to begin with the contract interpretation or modification issue. In this case, the relevant provision of the contract about the compensation due to the appellant is provided for in paragraph 6B of the contract. And it's the contention of the appellant that this provision is at the appropriate level. No one asserted ambiguity. But there was disagreement on what it meant. Yes, there was disagreement on but the plain meaning of the contract was unambiguous and the plain meaning was that the post-termination compensation was 30% of the consultant gross profit paid for the one year period immediately after termination. And that was paid at 40%, correct counsel? It was paid at 12%. No, I'm saying that 40% was what he was receiving when he was working as a salesperson. And then for termination of convenience, what did the contract call for? 30% instead of 40%. Of what he was receiving. Well, the commission in earlier provision in paragraph 3 of the contract, the commission was set at 40% of the consultant gross profit. The termination provision payment in paragraph 6B set it at, excuse me, the commission was 40% of the consultant gross profit. Paragraph 6B set the post-termination compensation at 30% of the consultant gross profit earned. Was that the language that was used? Pardon me? Is that the language that was used? That's the language in the contract, yes. Doesn't it say 30% of the amount that he would have received at the time that he was working for them? And I need to find it specifically. It says 30% of the consultant gross profit otherwise earned. Right. What does that mean? Well, it means what it says. What does otherwise earned mean? Otherwise means what would have happened if there had not been a termination, in our view, and that's our argument. And that would have been 40%, correct? Well, his commission was 40%, but the consultant gross profit is the consultant gross profit. And that is set by Mr. Bowen and it is earned or accrued or becomes a reality when there is a sale and the sales proceeds are collected. And the paragraph 6B doesn't refer to, doesn't use the word commission. But it says otherwise earned. Yes. Doesn't that mean what he would have earned, 40% he would have earned that he kept working? Well, it's opposite. Is the answer to that yes or no? The answer to it is no. And here's why. Okay. The gross profit is first of all set by the sales entity that sells the product. And it's set so it can be done in a competitive way inside the market. And it's even referred to by the company as the consultant's gross profit. And so the consultant's gross profit, whether it's earned before or after termination, is a portion of the sales price that the consultant had set. When it's collected, it's earned. And instead of a commission of 40% of the consultant's gross profit, post termination the compensation or the commission is 30% of consultant gross profit. And it is the consultant gross profit that is earned. 100% of it is earned. It doesn't use the word paid. The commission and the consultant gross profit are two different terms which have well established meaning not only in the contract but in the course of conduct between the parties. And as a result, it's our position that the trial court judicially modified the plain meaning of the provision in the contract where there had been no assertion of ambiguity. Why doesn't your construction of this contract read out the terms or the words that would have otherwise been earned? Our construction includes those words and... Well, based upon the argument you are making, the argument would be the same if those words didn't appear, wouldn't it? Well, you would have to say something about the consultant gross profit. It would have to be the consultant gross profit collected which would be the same thing as earned or the consultant gross profit paid by the buyer of the product during the one year period. If you just took out otherwise earned, the otherwise earned refers to... the earned part refers to... Well, he was entitled to 40% of the consultant gross profit when he was working, right? Yes. And your position is he was entitled to 30% of the consultant gross profit when he was terminated for convenience, right? Yes. Okay. And that's all the contract would have to say if you were right. But it doesn't say that. It says 30% of the consultant gross profit that would have otherwise been earned. So those are unnecessary words given your construction of what this contract is supposed to mean. We're not saying they're unnecessary and we're not excluding them. Well, you've read them up. No, we're not, Your Honor. We're giving meaning to every single word in that paragraph. We're giving it its plain meaning, its full meaning, the meaning that's consistent not only with the contract but with the course of conduct of the parties previous to that. A payment was actually made voluntarily post-termination and it was calculated following the exact language of paragraph 6. It was 30%. Counsel, let me ask you, wasn't that a payment that was made based on their asking your client personally as well as the consultant to not compete with them, to agree to not compete with them, and that was something completely outside the contract. Isn't that right? That is the position that was claimed at trial by Coral Chemical Company, but there was not a contract tendered with a check in it for that amount. There was a check issued and then a statement by them that they didn't want him to compete with them. And he did not compete with them personally. The party of interest in the company... The company didn't compete, but then eventually your client obtained new employment and did compete and actually took clients that were previously clients of his former employer. Absolutely that happened. But the contracting party appellant before the court did not compete in any fashion. It folded up upon termination. And that's my point, Counsel. This 30% payment that was made, at least it was represented that that was made because it involved not only the corporation but also your client personally. Is that correct? Because they stopped paying after he got a job and started competing. That was the argument made at trial. Yes. We believe that our argument is solid. We believe we're giving meaning to every word in that paragraph. We believe, paragraph 6B, we believe that if meaning is given to every word and that it's not altered and that there are not amounts of post-termination compensation was reduced by the trial court by 60%. Sometimes we look at simple math calculations and kind of gloss over them, but multiplying, inserting a multiplier of 40% creates a reduction of 60%. That's a substantial reduction based upon what we believe the plain meaning of paragraph 6B is. And we are not, in our analysis, omitting phrases.  The entire consultant gross profit was earned by Bowen. Bowen sets it. Bowen makes the sale. Bowen locates and finds the buyers. And there's another provision in the contract that says there's no payment due Bowen until the amount is actually collected. It's hard receipts that it's based upon. It doesn't say that 40% of the consultant gross profit was otherwise earned and post-termination, then we're going to pay 30% of that. That is not what the contract says in paragraph 6B. Once the entire consultant gross profit has been earned, then a commission post-termination of 30% is due. And this is a question of law. It's a noble review in our suggestion to the court. And we believe that following longstanding laws pertaining to contracts that no reversal on this issue is in order. I'd be pleased to answer any questions about that issue. If there are none, then I would move to the question about Supreme Court Rule 137. Before our panel here, I'm not quite sure how long, but pretty close to four decades worth of trial court experience. And one of the things I think we all share is the notion that requests for sanctions under Rule 137 are soundly addressed at the court's discretion, and appropriately so, the trial court's discretion, because trial courts are in a much better position than we are from a cold record. We get a sense of, are games being played? Is bad faith being used here? Are these circumstances where lawyers aren't really being And Judge Lawrence, it looks like he gave a lot of attention to this case, disagreed with your sense that Rule 137 sanctions are appropriate here. Why should we second guess it? It is the quality or the meaning of the type of evidence which was presented to claim misconduct. Presently, in the national media, in the Arias murder trial, there was a psychological witness for that murder defendant that had some expertise in whether Snow White was a bad or female. To try to draw an analogy here, I believe their claims about misconduct are somewhat similar to the Snow White defense that's presently being presented in that case. Well, counsel, let me ask you this. There was testimony during the trial that at the time, there was danger of that account being lost, that there had to be another salesman who kind of shored things up and fixed the problem with respect to how they felt after that visit. They felt that it was inappropriate for your client to approach them about doing some type of deal with lozure with them and Caterpillar. Although that didn't end up persuading the trial court that there was misconduct, isn't it fair to say that there was an issue there? There was an issue to be decided and it wasn't a matter of just frivolousness? No, it was absolutely entirely frivolous. There was not a scintilla of misconduct evidence. There were two events that were claimed to create misconduct. First of all, the visit to Lozure Oil. No criticism there. If you look at the specific items, the offense that you're referring to, I believe primarily related to a conversation between Tom Bowen and the sales manager of that company, where Tom simply suggested, if you'd like to get your foot in the Caterpillar door, I'd be glad to help you. And he took offense at that because he thought, and it's explained in the record, that his company could very capably handle that without any outside assistance. Wasn't this a trial where Judge Lawrence heard all the witnesses who testified about all these actions? Yes. And he decided that the claims of the defendant in this regard were not made in bad faith, didn't he? He did. And we should sit here, read this cold record, and say, I'm sorry, Judge Lawrence, I know you heard and saw these people, but we disagree. Part of the cold record, Your Honor, is the testimony of the CEO, principal owner of Coral Chemical Company, and in his testimony, in an unambiguous direct fashion, he said that this was not misconduct. That's, you know, uncontradicted testimony by the leader of the company. Who also stated that he left those matters to someone else, though, correct? Yes. And Judge Lawrence was required to accept his explanation and disregard others who thought otherwise. Is that your position? Well, I believe Judge Lawrence would be clearly entitled to weigh his testimony together with the testimony of others in his company, but Judge Lawrence should be overpowered in his analysis by the admissions, the direct admissions of that testimony. That testimony took on a judicial admission quality which doesn't entirely take away a trial judge's ability to make evaluations, but it comes very close to doing that, and it was so clear and direct that if it had existed previous to trial, it could have clearly formed a and prevented a trial from occurring on questions about whether missing donuts. That's why I call it something similar to the Snowflakes. Excuse me, Mr. Turner, your time is up. The light's on. Thank you. You'll have the opportunity to address this again in rebuttal. I appreciate it. Thank you very much. Mr. Wood. Good morning. Good morning. There, I'd also like to acknowledge before I start today, the person with me is an associate from our office, Brandon Fairman, who put in a good deal of work on this brief. I hope this experience won't lead you to think you're in the wrong line of work. Welcome to the court. Thank you. I would like to start, Your Honors, with what I would call the misconduct issue, or the issue that we brought to the court. And specifically, I'd like to point the court's attention to, and I know the court's read the briefs, obviously, and is aware of the issues here, but specifically in a few minutes, I'd like to bring it back to the court's resolution on July 4th, 2012, of the trial court. And point out that in that... Does the bullet engage in misconduct on that question of determination? Yes. Okay. Go ahead. The court, in their opinion and order, dealt with that up front, if you will, in the first part of that order. And they used Black's Law Dictionary. They used Black's Law Dictionary because the contract here didn't strictly define misconduct. There are some contracts that do, but there are some contracts that don't. And here we have one that did not. Turning to Black's Law Dictionary, the court centered on... When I say the court, the trial court centered on that part of Black's Law Dictionary that says, quote, and I'm quoting from the opinion and order, a dereliction from duty, comma, Black's Law Dictionary also includes in its definition, transgression, excuse me, of some established and definite rule of action, a forbidden act, a dereliction from duty, unlawful behavior, willful in character, or improper or wrong behavior. And I would say that complete, and we would argue that that complete definition is much more expansive than the part centered on by the trial court. Did you argue that at the trial court? I don't recall. I believe what we did is we copied the definition from that page of Black's Law and tendered it to the judge. I'm trying to speak from memory. I don't know if that's within the record. I apologize. But I can safely say I would not have argued only that portion that's quoted within the order. Well, you cited the dictionary definition from Black's Law Dictionary to the court. And the court came up with an application of the dictionary definition you cited, which contains multiple examples. And the one or aspect of it that the court cited, now you're telling us you don't like. What's wrong with this picture, counsel? How about not citing it at all or not agreeing to use it? Wouldn't that have been the better course of action than coming up on appeal and saying, by the way, you know, that thing we cited to the trial court, we don't think it was such a good idea anymore. I've been doing this for 24 years. I have yet to try the perfect case. I don't expect I ever will. With that said, I'm just asking the court, this court, to look at the more expansive definition of Black's Law Dictionary then quoted in the opinion in order. Can I say that I have special knowledge that Judge Lawrence didn't look at that expansive at all? I don't know that to be the case. He very well may have made his decision after looking at that entire expansive definition. The question I just asked Mr. Turner seems applicable here as well. Why should we second guess him? It seems like a reasonable application of a dictionary definition containing multiple parts to the facts as he found them. What's the problem here? I understand the deference to the trial court. I think that's obviously a good rule and a long-standing rule. But here, if you go on in the opinion in order of the trial court, it says, while plain misconduct was not ideal, and then it was not quote dishonest. Is not ideal the standard of what constitutes misconduct? No. I wouldn't think so. But he goes on to say it was not quote dishonest or conduct considered to be a dereliction from duty or unlawful behavior. Is he wrong? Is the court wrong in that? I believe he is. But in this case, there is also the improper or wrong behavior. And granted that really expands the definition of misconduct here. But it still doesn't change the testimony of the CEO. Well, I believe the testimony of the CEO has been mischaracterized here. Well, I read his testimony and he clearly stated that there was no wrongdoing in the conduct. I believe what he has stated here is to a very specific question and answer that, no, there's nothing wrong with that. And he was asked about each assertion of wrongdoing. Isn't that correct? When he was on the stand, he was asked about each example and said that there was nothing improper about it. I don't believe he was asked facts specific concerning the conduct that was alleged by Boland. And in this instance, please remember, this is in sales. Mr. Boland is in sales. And in sales, it's kind of like practicing law. The client's always right, the customer's always right, that sort of theory. And in this case, EK Machine, in particular, found it important enough to complain to Corl concerning Mr. Boland's condom. I think that's the response. Of the witnesses that were presented, the only one that believes what Mr. Boland did at EK Machine that was appropriate is Mr. Boland. All the other witnesses, a customer, a client. And your CEO. And again, I disagree with the assertion and characterization of his testimony wholesale saying that what Mr. Boland did was correct. Counsel, I want to ask you about the pre-judgment interest. The trial court declined to award it because it determined that the amount owed was not fixed and easily calculated. Why is that? What about this wasn't fixed and easily calculated, given the discussion you heard earlier about the contract and what it provided and all the rest of it? Do I believe it was fixed and easily calculable? I do. Because... Well, then why shouldn't pre-judgment interest have been awarded? Because there was a vast disagreement about that very formula. And that's what part of this trial was about. Well, okay. Let me state it differently. The trial judge rejected Mr. Turner's argument concerning the construction of the contract determination by convenience what was ordered. Is that right? Right. Having done so, having now determined, okay, it's 30% of the 40%, in effect. Now we know. Why wasn't, why can't, why shouldn't the court, as requested, have awarded pre-judgment interest based upon the findings the court made as to the fixed amount? Well, I, again, I don't believe it was that. You can always look at it from your perspective, or my perspective, if you will, in this case. And I believe the language of paragraph 6b is clear. I believe that all along. We presented that argument at court. That's the 30% of the 40%? Yes. Okay, well, no, no, I'm not arguing it. From the trial court's point of view, and for us on appeal, let's assume the court was right. And after all, the court, having made that determination, ought to assume it's correct. Going back to the trial court's position. Plaintiff asked for pre-judgment interest. Now plaintiff's rejection, plaintiff's argument about the 30% of the whole sum was rejected. My question to you is, given that the trial court has now determined 30% of the 40%, that's a fixed amount, easily determinable. Why shouldn't the plaintiff have received pre-judgment interest on that sum, as requested? They ask you for pre-judgment interest. The court says, ah, it's not easily determinable. Seems to me that's not correct. The trial court, and I'm reading from the second to last paragraph of the trial court's order, the court finds that pre-judgment interest is not appropriate in this case, as there is not a fixed or easily calculated amount due from the debtor-creditor relationship that has come into existence by virtue of a written instrument, and that there was no unreasonable or fictitious delay on the part of the defendant to merit awarding pre-judgment interest, as defendant has raised an honest dispute as to what amount, if any, was due. But that last point really doesn't apply, does it, in determining pre-judgment interest? I'm not sure why that's in the... Well, I'm not sure it might explain why the court didn't do it, but that's really not the legal criteria. Having prevailed at the trial level on the amount due, you won there. Yes. Why shouldn't the plaintiff receive pre-judgment interest on the amount that you say is really the amount due? I guess my best answer is it's really a creditor-debtor relationship in its classic form. Is this a bank? Well, you have an instrument of writing here. It's the basis on which the sum is due in owing. I guess, again, from my standpoint, I believe the amount was easily calculable. I believe the trial court got that right. But, as this court knows, there was significant argument on that issue. So, to classify it as easily calculable... Well, you see, you were just so persuasive, counsel, you won! Now the court should say, okay, what Mr. Wood said, I'm going to put 5% on that. I don't think the trial court should have done that in this case. Because I don't think it fits the definition of the easily calculable. It was not easily calculable in this case. We went through significant effort to do that. The record shows that. So, when you read the words easily calculable, you think that it means if you agree on the amount versus meaning that it's a simple calculation once the court determines what's owed. I guess I would define easily calculable perhaps as there is a sum due with a set interest rate, and then that sum can be applied. I mean, there's computer programs where you can plug in those two amounts and give what's due, assuming certain payments or non-payments, on any given day that will tell you what's due. That is easily calculable. Had Mr. Turner abandoned or never brought his argument about... that you heard earlier and said, oh yeah, we agree, it's 30% of the 40%. Would there be any issue then on pre-judgment interest? Had a trial he agreed with that? Yeah. I think at that point in time, if he had agreed with that, we wouldn't have had a trial. Well, that's not my question. If he had agreed with that, I think we would have tendered the amount. I'm getting a bit of field here too. I'm not going to mention other trials ongoing in the media, but in this case, what's happened is a tender by my client has already been made of the sum that was awarded. I know that's not in the record, but there's other interests that were due to that issue of post-judgment that my client wasn't real enthusiastic about, over 9% of the issue, but the pre-judgment interest here I just don't think applies. And I think the trial court got it right. Can I ask you to address the calculation in this case of the profit? It looked to me like under Section 3A of the contract, is it correct that compensation is defined as BMS will receive 40% of the gross profit of all coral product sales it generates? And you're on Paragraph 3A, correct? 3A. Yes. And that's what defines the 40%. Is consultant gross profit defined somewhere in the agreement? I don't think consultant gross profit is defined strictly within the agreement. I think there was testimony in the record concerning consultant gross profit. I think that was tendered, if memory serves me, I think by both Mr. Boland and Mr. Gordy. To mean what? And I don't think... Because 3A says 40% of the gross profit of all coral products is what Mr. Boland gets compensated. Right? That's what 3A says. And then in 6B it's talking about consultant gross profit. And consultant gross profit, and I'm trying to think back, consultant gross profit takes into account the amounts that coral and Boland Consulting considers to be cost associated with that sale. It's the net versus the gross, if you will, of a sales event. If I'm recalling the definition of consultant gross profit. So it is different than the gross amount of sales generated. Not gross amount of sales, gross profit, right? So 3A talks about gross profit. 40% of the gross profit is compensation to Boland. Gross profit for all coral product sales it generates. Correct. Right. But not gross sales. It's easy to get these terms mixed up, so I want to be particular about it. Well, actually 3A does go on to define that in the next sentence. For the purpose of this agreement, the gross profit shall be the difference between the sales price and the material cost. So in essence, 3A in that next sentence does kick it down. Unfortunately, neither party included the contract in the appendix to the briefs. Well, it's not the appellant's job to do that, in my opinion. But when the appellant doesn't do it, it would have been helpful for you to do it. The record went to the authoring judge in this case, and so the other two people don't usually get the record ahead of time. We can look at it afterwards. It's no problem. But it's very helpful to have the contract included in the appendix when you're looking at it. I agree, and that's my oversight. I didn't realize it was not included in this case. All right. Could you go ahead and address the argument that Mr. Turner made, though, about the way this was calculated? He's saying that would otherwise have been earned by BMS as a term of art under this contract. Well, I wouldn't. Obviously, we don't agree. I think the language here is very clear. In fact, turning back to the court's order and the trial court's opinion, they not only found it was clear, their language is, quote, paragraph 6B of the agreement clearly shows that the proper measure of payment is 30 percent of the 40 gross profits. There's a reason that the language is that way. And that testimony was proffered by Mr. Dorey in this case. And that is that amongst differing sales consultants for Coral, there are differing rates. Not everyone's 40 percent. Some could be 30, some could be 40, some could be 50. And even, I think the testimony showed that even within specific consultants or individual consultants' books of business, there may be differing rates on differing clients of that consultant. So that's the way, or that's the reason why the language is the way that it is. And I think Mr. Dorey in the record gave clear explanation to that. I don't know of any contradiction by Mr. Bowen to that testimony within the record. So consultant gross profit would not be a term that you would use with respect to Coral's And I think that's what the exhibit and the trial court also referenced that within its order. I forget which, I think 13 for some reason rings a bell. He used exhibit 13 from the trial court record because that's the one that correctly showed the measure of damages that the court thought were there and that were awarded. So in that case, there is an explanation as to why the language is the way it is. And it's the fact that there are the differing rates among consultants and even within individual consultants' books of business. I'd also like to address briefly the issue of this where we admitted that it was 30 percent because we paid him a payment at 30 percent. That's absurd. The letter of October 1, 2009 from my client, Bowen, and it's page 31 of the record. I'll read from it. It references this is a termination for misconduct. It then references that that 30 percent is being made, quote, based on your company and you honoring a non-compete commitment. It goes on to even say this offer is not required under the conditions of your marketing agreement. I don't know how much clearer it could be on those terms. So then those were reiterated in the October 9, 2009 letter. And when they found out that Mr. Bowen individually, and whether we call him Mr. Bowen individually or however he was competing, when they found out that he was competing, that's when the payments stopped. And I think those two facts, the fact that it was referenced in the letter, and this is a letter that's written long before anyone thought of a lawsuit. I think that's relevant to the issue of 137 issue. It was written where they defined this is a termination for misconduct. This offer is not required under the conditions of your marketing agreement. And so the argument that, well, aha, you paid 30 percent, therefore your agreement is 30, doesn't apply. Thank you, Counsel. Mr. Turner, any rebuttals, sir? Okay. I'll try to be brief here. With regard to the 30 percent of the 40 percent and the questions about lawsuit, this was a sales entity that was solely owned by Tom Bowen. He had spent five years pioneering the Caterpillar account just to get his foot in the door for coral. That was a major accomplishment. Caterpillar is a major purchaser in its manufacturing plants of chemicals and in the process of manufacturing metal machines and equipment. And when out of the blue he gets a letter of termination with no prior warning, no prior questioning of him or anything, that's a shock to his system. The letters that were referred to by Counsel about, well, no one is thinking about a lawsuit, the person responding to those letters was me. And my response was that this contracting party is not going to be competing. If you look at the intercompany memorandum from Peter Doherty to the accounting or the financial part of the company, it says that if he's not going to compete with the company, he's going to be paid 75 percent of the consultant gross profit collected or it also uses the factor of 30 percent of the consultant gross profit there. It's not coincidental that that matches what we believe to be the plain meaning of paragraph 6B. Let me ask you, in 3A, isn't his compensation determined to be 40 percent of the gross profit? Yes. And gross profit is different than consultant gross profit, isn't it? No, they're identical. And the evidence at trial, repeated many times, those are identical terms. It just so happens that they didn't put the word consultant in there. If you look at the accountings provided by Corl, you'll see that those accountings refer to a consultant gross profit and if you look at how he had been paid previous to that, previous to the termination, it was always on the basis of consultant gross profit. So if there is any question about whether gross profit is the same as consultant gross profit, the conduct of the parties where he was paid 40 percent of the consultant gross profit helps us know without a shadow of a doubt that in the contract, the paragraph 3 reference to gross profit is the same term as the paragraph 6B reference to consultant gross profit. They're intended to be the same and the practice was that they had the same meaning. But to make sure I understand your answer to Justice Pope, your position is there was no dispute at the trial between you and the other side on what that term meant? Yes. That gross profit and consultant gross profit, there was never a dispute that that had the same meaning and referred to the same set of numbers. Mr. Turner, I also just wanted to mention to you that since this whole dispute is based on a contract, it would be very helpful to have that included in an appendix to the brief. I apologize for that, Your Honor, and that omission won't occur in other cases if there are any. I apologize for it occurring here. We did include in the brief excerpts that we thought were pertinent. I was, quite frankly, I'm not familiar with the workings of the court. I didn't realize that only the presiding justice got the record. I didn't realize... We have access to it and we oftentimes look at it after orals, but the justice that's working on the case itself as the author has the record first. So prior to orals, ordinarily, we don't see the record. Thank you, counsel. Time is up. We'll take this matter under advisement. We'll be in recess for a few moments.